IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Earl W. Burkholder, Jr., et al.,                                    Case No. 3:02CV7422

               Plaintiffs

      v.                                                                       ORDER

International Union, United
            Automobile Aerospace and Agricultural
            Implement Workers of America,
            Local No. 12, et al.,

               Defendants

      Plaintiffs, current and former machine repair employees of Daimler Chrysler at two

Chrysler Jeep plants in Toledo, Ohio, bring suit alleging that various actions taken by union

defendants (UAW International (International) and UAW Local 12 (Local 12)) gave

preferential treatment to other skilled workers and thus violated the unions' duty of fair

representation.

      Jurisdiction is proper under 28 U.S.C. § 1331.

      Pending are union defendants' motion for summary judgment [Doc. 180] and

plaintiffs' motion for partial summary judgment [Doc. 189]. For the reasons discussed below,

defendants' motion shall be granted, and plaintiffs' motion shall be denied.

**Background**

Until 1997, the Mechanics Education Society of America (MESA) represented machine repairmen at Toledo Jeep plants. The MESA contract was separate from the contract governing other skilled trade employees – including electricians and millwrights. The Local 12, represented these other workers.

Likewise until 1997, the MESA collective bargaining agreement established a Dispute Resolution Committee. This committee, which consisted of two representatives each from management, MESA, and UAW, was to resolve disagreements as to work assignments between trades.

In 1997, the MESA collective bargaining agreement expired. Local 12 became the sole representative of skilled trades employees, including those formerly represented by MESA.

Local 12 signed a new collective bargaining agreement with Daimler Chrysler. Article VI of that agreement, addressing "Toledo Assembly Plant—Operational Understandings," provided, in part:

Paragraph 1—Joint Objectives and Goals

* * * * *

(78) The Company and the Union enter into this agreement with the joint realization that maximum utilization of human resources potential is vitally important to the objectives of the Company, the Union and individual employees. A critical element of human resources development is the adoption of a participative style of operation. The participative style acknowledges the important contribution that can be made by soliciting input from employees regarding matters which directly affect them in their work environment . . . The Company and Union recognize that a cooperative and participative work environment is essential to the success of the Chrysler Operating System, the organization, and the individual employee.

* * * * *

3

Paragraph 3—Union Responsibilities

* * * * *

(81) Based on the Company's long term commitment to the Toledo Assembly workforce, the Union commits its long term cooperation in recognizing the principle that the flexibility of the Company must be maintained in order to improve quality, and efficiency while implementing work practices that enhance an overall flexible production system. This flexibility includes, among other things, a minimal number of job classifications, flexibility in job assignments and job transfers, acceptance and promotion of extensive training and retraining, acceptance and promotion of increased responsibility and accountability of individual employees and teams of employees.

[Doc. 183-1, at 12-13].

With regard to skilled trades, the agreement provides:

Paragraph 7—Reduced Classifications

* * * * *

(93) Skilled Trades classification shall be effectively reduced to reflect the consolidation of former M.E.S.A. classifications with UAW, Local 12 in addition to minimizing traditional lines of demarcation with respect to job responsibilities. Furthermore, the focus of multiple job responsibilities within Skilled Trades classifications will be directed to support production activity. Skilled Trades classifications may be limited to ten (10) classifications.

[Doc.183-1, at 16].

The agreement also defines "flexible work practices" and discusses dispute resolution:

Paragraph 8—Flexible Work Practices

* * * * *

(95) In order to clarify what constitutes flexible work practices, the parties recognize that many tasks are properly performed within the scope of two or more classifications. During the course of completing a principle assignment, employees may properly perform complementary and incidental tasks or series of such tasks that if performed separately may be regularly assigned to a particular classification under the following circumstances:

4

(96) The time required in relation to the principal job is relatively short. The employee has the capability to perform tasks. The work can be performed safely.

(97) The parties agree to discuss and objectively assess flexible work practices in an effort to maximize operational efficiency relative to expanding employee basic responsibilities inclusive of incidental non-skilled work and non-production support traditionally performed by Skilled Trades. Skilled Trades job responsibilities will be focused but not limited to supporting production activity.

(98) Disputes arising from the above understanding may be referred to the Chairman of the Shop Committee and Union Relations Supervisor to expeditious resolution.

(99) The parties shall attempt to resolve disputes outside the grievance procedure. Unresolved matters may, after joint good-faith efforts have failed, be ultimately referred to the grievance procedure for resolution.

[Doc. 183-1, at 17].

The new agreement between Local 12 and Daimler Chrysler did not contain a Dispute Resolution Committee as had the prior MESA and UAW agreements.

When Daimler Chrysler decided to build its new Toledo North Jeep plant, problems arose as to which trade should do what work. Machine repairmen, formerly represented by MESA, believed that work that they should do was being done by members of other trades (principally millwrights) which Local 12 historically had represented.

In response, the UAW, in consultation with Daimler Chrysler, formed a Lines of Demarcation Committee in early 2001.[1]

---

[1] Notices about the formation of the committee and who was running for a seat are dated January 13, 2001, and January 20, 2001, respectively. A notice announcing the members of the committee is dated January 30, 2001, however, powerhouse representatives were added at a later date.

The committee included one voting representative from each of eight trades. The other trades with representatives, in addition to the machine repairmen, were millwrights, electricians, machinists, tool and die, tool/layout inspector, powerhouse engineer and powerhouse mechanic. The committee held meetings, viewed equipment, discussed lines of demarcation regarding the equipment, and voted on the lines of demarcation for the new plant.

The powerhouse engineer and powerhouse mechanic only worked in the powerhouse and had no work at the new Toledo Jeep plant. Whenever there was a dispute over whether machine repairmen or millwrights should receive particular work, the powerhouse representatives on the committee always voted with the millwrights.

The committee issued twelve lines of demarcation decisions between June, 2001, and May, 2002. The May 31, 2002, decision was a clarification of a November 20, 2001, decision. These decisions transferred a large amount of work previously done by machine repairmen to millwrights and electricians. The committee made recommendations about lines of demarcation to Daimler Chrysler, which always adopted the committee's recommendations.

In August, 2001, discontinuance of a product line and volume reduction at the old Toledo Jeep plant resulted in the layoff of 1,772 employees. The layoff affected a larger percentage of machine repairmen than other skilled workers.

Some skilled trades employees, unhappy with the committee's demarcations, signed a petition asking the International to review work assignments in the new plant. Between 2000 and 2003 Jerry Brown, a International staff representative, visited Toledo three times.

Part of Brown's job for the International was to help resolve disputes about work assignments.

Two of Brown's visits related to lines of demarcation. During both visits, Brown only looked at things UAW representatives told him were in dispute.

Disputes about work assignments continued through the 2003 contract negotiations. A letter dated November, 2003, from Thomas Maxon, a Senior Manager with Daimler Chrysler to Nick Vuich, Chairman of the Local 12 Jeep unit entitled "Resolution of Jurisdictional Work Assignment Disputes," stated:

> This is to confirm the Company's commitment to the assignment of work in a manner consistent with these mutually agreed upon jurisdictional determinations. If the Union believes the work was assigned in a manner inconsistent with such determinations, the Union should bring the issue to the attention of the Labor Relations Supervisor for immediate resolution.
>
> If the matter cannot be satisfactorily resolved by the local parties, the matter may be referred to the UAW Regional Representative and Corporate Union Relations for resolution.

[Doc. 183-1, at 18].

Sometime after these negotiations, Fritz Edwards became the Skilled Trades Committeeman and Dan Henneman succeeded Vuich as Jeep Unit Chairman. Henneman assigned Edwards to establish the jurisdictional determinations.

Edwards called a meeting with the skilled trades stewards. Then-machine trades steward, Gale Davis, did not attend the meeting because it was at 3:00 a.m. Later, after Richard McIntyre succeeded Davis as machine trades steward, Edwards called another meeting of skilled trades stewards to discuss lines of demarcation. McIntyre attended, but got upset and left halfway through the meeting.

7

Henneman later emailed the stewards informing them of another meeting and stating that everyone had to stay until issues were resolved. McIntyre emailed back that no one would keep him against his will. He later testified that his grandson's birthday was that afternoon and he intended to leave at 3:00 p.m. He also testified that he did not attend the meeting because he had a fight with his wife the night before and had stayed home.

Edwards continued without skilled trade steward input. He personally observed operations in the Toledo North plant and talked to the tradesmen performing those operations. McIntyre sought to become involved with determining the lines of demarcation but Edwards told him the project was not yet at his level. In June, 2005, Edwards issued new lines of demarcation for two areas: the body shop, and trim, chassis, final (TCF).

Pursuant to the collective bargaining agreement, Daimler Chrysler and the union jointly conduct an apprenticeship program for machine repairmen. The collective bargaining agreement also incorporates national apprenticeship standards.

The "Job Bank" is part of the Employment Security System. Job Bank funds pay laid off employees to perform work either at the plant or charity work in the community. Individuals may be placed into the job bank, or individuals outside the job bank may be paid job bank funds to complete certain jobs.

### Procedural Background

The union defendants previously moved for summary judgment on May 15, 2006. [Doc. 108]. After supplemental briefing, on October 26, 2007, I granted the motion on the basis that plaintiffs failed to exhaust internal union remedies and were not excused from doing so. [Doc. 168].

On November 3, 2008, the Sixth Circuit Court of Appeals vacated that decision and remanded for a determination on the applicability of the statute of limitations. *Burkholder v. Int'l Union, United Auto., Aerospace & Agricultural Implement Workers, Local No. 12*, 299 F. App'x 531 (6th Cir. 2008) (unpublished disposition). The court also noted that if I find that plaintiffs filed the action within the limitations period, I must determine whether plaintiffs' failure to exhaust internal union remedies is excused by the union defendants' breach of the duty of fair representation. *See Williams v. Molpus*, 171 F.3d 360, 369 (6th Cir. 1999) (providing that "[t]he general requirement that a grievant must exhaust his or her internal union remedies, however, is excused if the union breaches its duty of fair representation").

The union defendants have renewed their motion for summary judgment, alleging: 1) the statute of limitations bars all claims regarding lines of demarcation; and 2) they did not breach their duty of fair representation. [Doc. 180]. Plaintiffs filed a motion for partial summary judgment on the statute of limitations issue. [Doc. 189].

### Standard of Review

A party is entitled to summary judgment on motion under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "requires

the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

In deciding a motion for summary judgment, a court accepts the opponent's evidence as true and construes all evidence in the opponent's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 456 (1992). The movant can prevail only if the materials offered in support of the motion show there is no genuine issue of a material fact. *Celotex*, *supra*, 477 U.S. at 323.

## Discussion

## I. Statute of Limitations

Defendants argue that all claims regarding lines of demarcation are time-barred. Plaintiffs contend that these claims are not time-barred because: 1) the defendants engaged in continuing violations; and 2) in any event, some demarcation decisions were within the statute of limitations.

The statute of limitations for a breach of duty of fair representation claim is six months. 29 U.S.C. § 160(b); *DelCostello v. Int'l Bd. of Teamsters*, 462 U.S. 151, 155 (1983).

A claim accrues "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Robinson v. Central Brass Mfg. Co.*, 987 F.2d 1235, 1239 (6th Cir. 1993) (internal quotation and citation omitted). The determination of the accrual date is an objective one: "the asserted knowledge of plaintiffs is not determinative if they did not act as reasonable persons, and, in effect, closed their eyes to evident and objective facts concerning accrual of their right to sue." *Chrysler Workers Ass'n v. Chrysler Corp*. 834 F.2d 573, 579 (6th Cir. 1987).

10

## A. Continuing Violation Doctrine

The doctrine of a "continuing violation" originally arose out of employment discrimination claims under Title VII of the Civil Rights Act. Prior to the Supreme Court's 2002 decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), the doctrine of continuing violation, which tolls the running of the statute of limitations, applied in two situations, namely claims that the defendant either: 1) engaged in serial violations of plaintiff's rights under Title VII; or 2) had subjected the plaintiff to a hostile work environment. *See Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (noting that pre-*Morgan* "the Sixth Circuit . . . recognized two distinct categories of continuing violations, namely those alleging serial violations and those identified with a longstanding and demonstrable policy of discrimination").

In *Morgan* the Court rejected serial violations as a basis for applying the doctrine of continuing violation to toll the statute of limitations in Title VII cases:

> [D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the [statute of limitations] period after the discrete discriminatory act occurred.

536 U.S. at 113.

The continuing violation theory is not applicable to serial violations, the Court stated, because "[d]iscrete acts such as termination, failure to promote, denial of transfer or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 114.

In contrast to such discrete, and separately ascertainable and actionable incidents, "hostile environment claims involve unlawful employment practices that cannot be said to occur on any particular day, but occur over a series of days or years." *Sharpe*, *supra*, 319 F.3d at 267 (citing *Morgan*, *supra*, 536 U.S. at 115).

Even as so limited, there is uncertainty as to whether the continuing violation theory applies in claims that a union violated its duty of fair representation. *Compare Lewis v. Local Union No. 100*, 750 F.2d 1368, 1378 (7th Cir. 1984) (applying continuing violation doctrine to duty of fair representation claim) *with Devitt v. Potter*, 234 F. Supp. 2d 1034, 1042 (D.N.D. 2002) (stating that continuing violation doctrine does not apply in duty of fair representation cases). I see no reason why it should not, in view of the consideration that the Sixth Circuit has applied the continuing violation doctrine beyond Title VII cases:

> We previously have said that "[c]ourts have been extremely reluctant to apply this doctrine outside the context of Title VII." *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1105 n. 3 (6th Cir. 1995). Since then, we nonetheless have applied the continuing-violation doctrine to claims for deprivations of civil rights. *See, e.g.*, *Tolbert v. Ohio Dep't of Transp.*, 172 F.3d 934 (6th Cir. 1999) (applying continuing-violation theory in action brought under 42 U.S.C. § 1983 alleging racially discriminatory allocation of highway sound barriers); *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir.1997) (considering continuing-violation doctrine in case involving takings claim and due process claims for deprivations of liberty and property). No opinion has articulated a principled reason why the continuing-violation doctrine should be limited to claims for deprivations of civil rights and employment discrimination . . .

*Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 416-17 (6th Cir. 2007).

In addition to § 1983 claims, *Sharpe*, *supra*, 319 F.3d at 267, the Sixth Circuit has applied the continuing violation theory in ADEA claims. *Sherman v. Chrysler Corp.*, 47 F. App'x 716 (6th Cir. 2002).

12

Other courts have applied the continuing violation theory to duty of fair representation cases. *E.g.*, *Washington v. Service Employees Int'l Union, Local 50*, 130 F.3d 825, 826 (8th Cir. 1997); *Lewis*, *supra*, 750 F.2d at 1378; *Nellis v. Air Line Pilots Ass'n*, 815 F. Supp. 1522, 1537 (E.D. Va. 1993).[2]

The Sixth Circuit mentioned the continuing violation doctrine, but without resolving its applicability in the duty of fair representation context in *Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1001 (6th Cir. 1994). On the facts of that case, the court held that failure to pursue a grievance did not constitute a continuing violation. The court noted that "[a]lthough plaintiffs have correctly observed that the continuing violations doctrine can be invoked to extend a court's jurisdiction over violations occurring outside the limitations period, their case simply does not fall within its confines." *Id.* at 1000.

The court in *Noble* cited *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416 (1960), where the Supreme Court distinguished between two situations in the labor context:

> The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely "evidentiary," since it does not simply lay bare a

---

[2] At least one court, however, has held that the continuing violation theory is not applicable in duty of fair representation cases because "unlike harassment and retaliation claims, breach of the duty of fair representation claims can arise as a result of a single discrete act." *Devitt*, *supra,* 234 F. Supp. 2d at 1042 (noting that "it is well settled that the continuing violations doctrine is not applicable in duty of fair representation cases"). While that may be so, that should not preclude application of the continuing violation doctrine where it fits the factual circumstances of a duty of fair representation claim.

13

putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful. And where a complaint based upon that earlier event is time-barred, to permit the event itself to be so used in effect results in reviving a legally defunct unfair labor practice.

*Local Lodge No. 1424* involved a challenge to the continued enforcement of a collective bargaining agreement, based on illegality in its formation. The court rejected this argument:

It may be conceded that the continued enforcement, as well as the execution, of this collective bargaining agreement constitutes an unfair labor practice, and that these are two logically separate violations, independent in the sense that they can be described in discrete terms. Nevertheless, the vice in the enforcement of this agreement is manifestly not independent of the legality of its execution, as would be the case, for example, with an agreement invalid on its face or with one validly executed, but unlawfully administered.

*Id.* at 422-23.

On balance, I conclude that the continuing violation doctrine applicable in other contexts can, as a general proposition, toll the otherwise applicable six month statute of limitations in duty of fair representation cases. In light of *Local Lodge No. 1424*, the doctrine is not, however, of any help to a plaintiff where "enforcement of [an] agreement is manifestly not independent of the legality of its execution." *Id.* at 422.

### B. Application of Continuing Violation Doctrine:
### The 2001-2002 Demarcations

Plaintiffs filed their complaint on August 26, 2002. Plaintiffs claims are only timely if they accrued after February 26, 2002, unless there is some reason to take the claim outside the statute of limitations.[3]

_____

[3] Plaintiffs have abandoned their earlier argument that their appeal of the committee's formation tolled the statute of limitations. [Doc. 184, at 17].

14

Defendants characterize plaintiffs' claims as founded solely on the January, 2001, formation of the Lines of Demarcation Committee, which, according to defendants, is the fount from which flow all events and decisions about which plaintiffs complain. Defendants thus contend that all plaintiffs' objections to the committee's decisions are time-barred.

Plaintiffs characterize the committee's uniform and constant practice of transferring machine repair work from them to millwrights and electricians as constituting a continuing violation of the duty of fair representation. Specifically, plaintiffs assert:

> the decisions of the Lines of Demarcation Committee, stacked with members [*e.g.*, powerhouse employees] who did not even have any work at [the new Toledo Jeep plant], but who were beholden to the millwrights, formed a continuous violation, some of which occurred within the statute of limitations, and thus relief can be granted for all of the wrongful decisions.

[Doc. 184, at 22-23].

Plaintiffs therefore allege that each demarcation decision both before and after the statute of limitations accrual cut-off date of February 26, 2002, constituted part of a continuing violation which continued into the limitations period, and thus enables them to sue on all actions by the committee.

I disagree. Plaintiffs' claims describe a series of discrete allegedly wrongful actions: formation of the committee and each subsequent decision as to specific work assignments. These are, as the Supreme Court specified in *Morgan, supra,* 536 U.S. at 114, "[d]iscrete acts" and it is "easy to identify" the date they occurred. Because plaintiffs allege a series of distinct job by job discriminatory decisions, the continuing violations theory is not available as to any decisions prior to February 26, 2002.

Plaintiffs claim not be challenging the formation and makeup of the committee. But to apply the continuing violations doctrine in this case would be to allow them to do so.

Here, as in *Local Lodge No. 1424*, *supra*, the "vice" of having two powerhouse representatives on the committee voting repeatedly with the millwrights and against the plaintiffs is "manifestly not independent of the legality" of the formation of the committee. 362 U.S. at 432-33. As plaintiffs have mapped out their contentions, everything was set inevitably to flow in one direction – toward the millwrights and electricians, and away from the plaintiffs – once the powerhouse employees were on the committee In light of *Local Lodge No. 1424*, the continuing violation doctrine cannot overcome the limitations bar to a present challenge to that decision and its consequences. Only decisions after February 26, 2002, are not time barred.[4]

Also not barred are claims regarding demarcation decisions dated June 6, 2005. These demarcations were made by Skilled Trades Committeeman Edwards, not by the committee. These decisions are within the statute of limitations.

## C. August, 2001, Layoffs

Any claim plaintiffs make regarding the August, 2001, layoffs is also time-barred. Logically, layoffs in August, 2001, cannot result from events occurring *after* that date.

In any event, because the continuing violation doctrine is not applicable, claims as to layoffs prior to February 26, 2002, are time barred.

### D. Elimination of Committeemen and Skilled Trades Stewards

---

[4] Plaintiffs' motion for summary judgment on the statute of limitations issue is therefore denied.

Defendants also seek summary judgment as to plaintiffs' claim that defendants eliminated machine repair stewards and committeemen. Defendants point out that plaintiffs received the representation which the collective bargaining agreement provided. Any "loss" of stewards or committeemen occurred in 1997 when MESA merged with the UAW.

Plaintiffs offer no evidence to rebut defendants' contention. The statute of limitations bars any claim arising from the 1997 merger.

## II. Duty of Fair Representation

Defendants allege that, as to any claims within the limitations period, they have not breached the duty of fair representation. I agree.

It is well established that a union, as the exclusive bargaining representative of employees in a bargaining unit under § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), owes those employees a duty of fair representation. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). It owes this duty in negotiating and administering a collective bargaining agreement. *Breninger v. Sheet Metal Workers Int'l Ass'n, Local No. 6*, 493 U.S. 67, 88 (1989).

The duty of fair representation ensures that unions represent employees "adequately . . . honestly and in good faith." *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 75 (1991). To establish a breach of this duty, plaintiffs must show that the union's "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, *supra*, 386 U.S. at 190.[5] "Simple negligence or mere errors in judgment will not

---

[5] Plaintiffs argue that some courts have construed *Breininger*, *supra*, 493 U.S. at 88-89, as "loosening that [duty of fair representation] standard in the context of circumstances wherein the union has essentially assumed the role of the employer." [Doc. 184, at 25 n.10]. Plaintiffs, however,

17

suffice." *Walk v. P\*I\*E Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir. 1992). These three components – discriminatory action, bad faith and arbitrary conduct – form three "separate and distinct possible routes by which a union may be found to have breached its duty." *Black v. Ryder/P.I.E Nationwide, Inc.*, 15 F.3d 573, 584 (6th Cir. 1994).

A union's actions are "arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness . . . as to be irrational." *Air Line Pilots*, *supra*, 499 U.S. at 67 (internal citation and quotations omitted). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild*, 525 U.S. 33, 45-46 (1998) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953) "[A]n unwise, or even an unconsidered decision by the union is not necessarily an irrational decision." *Air Line Pilots*, *supra*, 499 U.S. at 78. The arbitrariness standard has been described as "highly deferential," *id.*, and "quite forgiving," *Trinka v. Local Union No. 688*, 30 F.3d 60, 61 (7th Cir. 1994).

The Sixth Circuit has stated that, "[i]n essence then, to prevail, a plaintiff has the difficult task of showing that the union's actions were wholly irrational." *Garrison v. Cassens Transp.*, 334 F.3d 528, 538-39 (6th Cir. 2003) (also noting that "[t]he wholly irrational standard is described in terms of extreme arbitrariness") (internal quotations and citations omitted).

To show "discriminatory" conduct sufficient to establish a breach of the duty of fair representation, a plaintiff must present "substantial evidence of . . . intentional, severe"

_____

recognize that the Sixth Circuit explicitly rejected this argument in *Hoskins v. Local 1853 Int'l Union*, 183 F.3d 507 (6th Cir. 1999) (unpublished table decision), so I do not address it.

18

discrimination that is "unrelated to legitimate union objectives." *Amalgamated Ass'n of Street Elec. Ry. & Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301 (1971).

To show "bad faith," plaintiff must show the union acted with "an improper intent, purpose, or motive." *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998). Bad faith "encompasses fraud, dishonesty, and other intentionally misleading conduct." *Id.*

Plaintiffs must also show that the union's actions caused them injury. *Wood v. Int'l Bhd. of Teamsters, Chauffeurs, Warehouseman & Helpers, Local 406*, 807 F.2d 493, 502 (6th Cir. 1986) ("'[C]ourts have held unions not liable for breaches of their duty of fair representation absent evidence that but for the union's conduct, the employee would not have been injured.'" (quoting *Anderson v. United Paperworkers Int'l Union*, 641 F.2d 574, 580 n.8 (8th Cir. 1981)); *see also Williams v. Molpus*, 171 F.3d 360, 364 (6th Cir. 1999) (holding that, in the grievance representation context, an employee must "prove that the union's acts tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach" (internal citation and quotation omitted)); *Black*, *supra*, 15 F.3d at 585 (same).

A union does not breach its duty of fair representation simply because it takes a position adverse to the interests of some members while benefitting others. *Humphrey v. Moore*, 375 U.S. 335, 349-50 (1964). Similarly, "[t]he mere fact that plaintiffs are in a minority group within their union organizations and that they were adversely affected by the actions or inactions does not establish that the union acted with hostile or discriminatory intent." *Ratkosky v. United Transp. Union*, 843 F.3d 869, 878-79 (6th Cir. 1988).

Courts have upheld union actions which favor one represented group over another as non-arbitrary. *See Jeffreys v. Commc'n Workers*, 354 F.3d 270, 276 (4th Cir. 2003) (holding

19

that union's interpretation of a contractual provision "necessarily favor[ing] some workers over others" did not violate the duty of fair representation); *Ryan v. Printing Pressmen's Union*, 590 F.2d 451, 457 (2d Cir. 1979) (noting that "it was almost inevitable that the union's drawing of a line would hurt someone" and "although it is unfortunate that . . . the ultimate harm fell on appellants, drawing the line elsewhere would . . . have caused harm to others"); *Forte v. Warehouse Employees Local 169*, 2000 WL 377698, *3 (E.D. Pa.) (holding that union did not breach its duty of fair representation when it accepted a contract that provided severance pay for some active workers but not for laid off workers who were recalled); *see also Ratkosky*, *supra*, 843 F.2d at 878-89 (holding that the establishment of a two-tiered seniority system which favors one group over another is insufficient to establish a breach of the duty of fair representation); *Baker v. Constr. & Gen. Laborers, Local 264*, 822 F.2d 781 (8th Cir. 1987) (holding that union's practice, in running a hiring hall that required plaintiffs to run up the stairs to receive a referral slip was demeaning, but not arbitrary, discriminatory or motivated by bad faith).

In *Forte*, *supra*, 2007 WL 377698, *3, an employer closed one of two plants. In negotiating a plant-closing agreement, the union was only able to get the employer to agree to provide benefits to those workers employed on a certain date, and not for workers who were laid off but maintained recall rights. The court held that the union's actions did not violate the duty of fair representation simply because the union "accepts a contract which provides the greater good for the greater number of the members of the bargaining unit, when it is clear that the wishes of all members of the bargaining unit cannot possibly be accommodated." *Id.*

20

In *Jeffreys*, *supra*, 354 F.3d at 273-74, an employer announced job cuts and the union encouraged the employer to adopt a different layoff system under the contract than the employer first proposed. Plaintiffs filed suit, claiming that the union's interpretation of the contract provision was arbitrary and an attempt to protect certain workers over others. The court found that either interpretation was plausible, and, in concluding that the decision was not arbitrary, stated:

> It is true that the Grievance's interpretation ensured more limited seniority rights, because long-time employees, like Jeffreys, would be sent to less desirable USAir locations. However, the Grievance's interpretation offered greater stability to USAir employees as a group by minimizing the number of employees adversely affected during times of financial crisis.

*Id.* at 275. The court concluded: "In short, the CWA, which bears the primary responsibility for construing the collective bargaining agreement, weighed the values of seniority and stability, and reached a considered judgment to which we must be 'highly deferential.'" *Id.* (quoting *Air Line Pilots*, *supra*, 499 U.S. at 78).

### A. 2002 Committee Decisions

As discussed above, only plaintiffs' challenges to the committee actions from April 10, 2002, and May 31, 2002, survive the six-month statute of limitations bar.[6]

---

[6] I note, parenthetically, that the May 31, 2002, demarcation is a clarification of a November 20, 2001, demarcation and it is not clear that it independently transfers any work away from machine repairmen. The demarcation provides:

In regards to bullet point #1 for Electrician: "Fault recovery and trouble shooting"

Defendants argue that plaintiffs cannot show that any action taken by the committee was arbitrary, discriminatory or in bad faith. Specifically, they argue: 1) plaintiffs cannot point to any term in the collective bargaining agreement guaranteeing them any particular work; 2) past practice is not determinative; and 3) the new plant had new equipment.

Plaintiffs respond: 1) defendants have offered no rational reason for the transfers in work away from machine repairmen and the work was work that was machine repair work by past practice and for which machine repairmen were better qualified; and 2) the equipment at the new plant is the same or similar to the equipment at the old plant.[7]

- • If a trade is performing a repair on a sail rail and a fault reset is required after completion, the particular trade (Millwright, Machine Repair, or Electrician) may reset the fault to complete the repair.
- • In the event a breakdown is visually Millwright or Machine Repairmen, they are to respond immediately. Trouble shooting is not exclusive to Electricians, if the nature of a breakdown is not obvious as Millwright or Machine Repair an Electrician will be contacted to respond and troubleshoot.

[Doc. 183-14, at 3].

Because I find that any transfer of work that occurred did not violate the duty of fair representation, I need not determine whether this particular demarcation caused any such transfer.

[7] Plaintiffs also assert that "[t]he makeup of the committee was arbitrarily chosen to result in decisions in favor of the millwright trade at the expense of the machine repair trade." [Doc. 184, at 33]. While I agree that I may look to evidence of actions outside the statute of limitations to explain actions within the statute of limitations, *Local Lodge No. 1424*, *supra*, 362 U.S. at 416 ("where occurrences within the six month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. . . . earlier events may be utilized to shed light on the true character of matters occurring within the limitations period"), plaintiffs cannot challenge the legality of the makeup of the committee or its formation. Thus, plaintiffs cannot base their duty of fair representation claim on the allegation that the committee was set up to disfavor machine repairmen or that machine repairmen were outvoted based on the makeup of the committee.

Construing the facts in the light most favorable to plaintiffs, and even if these two committee decisions caused machine repairmen to lose work that previously they would have done, I find no breach of the union's duty of fair representation.

First, plaintiff cannot show overt discrimination or bad faith.

To be sure, plaintiffs' complaint includes terms such as "clearly favored," [Doc. 68, at 11], and states that defendants "acted maliciously," [Doc. 68, at 14]. Additionally, plaintiffs' opposition states that the union shifted work "from a non-favored trade to favored trades" [Doc. 194, at 37] and plaintiffs' reply states that defendants used flexible work practices "as a subterfuge to shift work from machine repairmen to electricians and millwrights," [Doc. 191, at 3].

Plaintiffs, however, have not presented "substantial evidence of . . . intentional, severe" discrimination "unrelated to legitimate union objectives." *Amalgamated Ass'n of Street Elec. Ry. & Motor Coach Employees*, *supra*, 403 U.S. at 301; *see also Ratkosky*, *supra*, 843 F.2d at 878 (noting that the fact that plaintiffs were a minority within their union and were adversely affected "does not establish that the union acted with hostile or discriminatory intent").

Plaintiffs acknowledge that Daimler Chrysler wished to minimize grievances. The procedure defendants created and used for determining lines of demarcation is simply not "unrelated" to that important and legitimate labor-management relations and productivity objective. Plaintiffs similarly have pointed to nothing suggesting bad faith on the union's part.

Second, I find that plaintiffs cannot show that the union's action – through the 2002 committee decisions – were arbitrary. The 1997-2002 collective bargaining agreement

23

represented a break with the past in terms of how disputes over work assignments were to be resolved. While earlier Local 12 and MESA contracts provided for a Dispute Resolution Committee, the new contract emphasized "flexible work practices" and minimization of traditional lines of demarcation.

The portion of the contract specifically regarding operations at the Toledo Jeep plant stated that disputes arising from the flexible work practices policy "may be referred to the Chairman of the Shop Committee and Union Relations Supervisor to expeditious resolution." [Doc. 183-1, at 17]. The contract also specifically encouraged parties to "resolve disputes outside the grievance procedure," and noted that "[u]nresolved matters may, after joint good-faith efforts have failed, be ultimately referred to the grievance procedure for resolution." *Id.*

Plaintiffs argue that the union's goals of "stability in job assignments and minimization of traditional lines of demarcation did not require such a work shift" away from machine repairmen. [Doc. 191, at 3]. It is not my place, however, to determine whether meeting these goals *required* such an action, but only to determine if the union's action in doing so was arbitrary. The court in *Jeffreys*, *supra*, 354 F.3d at 275, recognized that stability is a legitimate goal.

As defendants point out, there is no "correct" demarcation of work in light of the new contract.[8] While there may have been a better way of resolving demarcation disputes or more equal lines of demarcation drawn, including some that may have given greater amounts of

---

[8] Plaintiffs assert that the equipment at the new plant was similar to or the same as equipment at the old plant and that this shows that the committee's lines of demarcation, which took transferred work previously performed by machine repairmen and gave it to other skilled trades, is arbitrary. Even assuming that plaintiffs' contention that the equipment was the same is true, this does not, in light of the new contract, mean that work on the equipment would always be machine repair work.

work to machine repairmen, I cannot say that the union's decisions were irrational. No matter what demarcations were made, some trade would likely be unhappy with them and the union's duty in this case was to "all whom it represents," *Ford Motor Co.*, *supra*, 345 U.S. at 338, not only to machine repairmen.

As in *Forte*, *supra*, and *Jeffreys*, *supra*, the fact that machine repairmen lost work and other trades benefitted does not a show *ipso facto* a breach of the duty of fair representation. Daimler Chrysler wished to reduce the number of grievances filed to enhance stability within its new plant. The union's decisions, as implemented through the committee, though costing the plaintiffs work, hardly fell outside the "wide range of reasonableness" which the law gives to unions. *Marquez*, *supra*, 525 U.S. at 45-46.

Defendants are, accordingly, entitled to summary judgment as to the two 2002 decisions that come within the limitations period.

### B. 2005 Demarcation Decisions

The 2005 decisions likewise do not violate the union's duty of fair representation.

Again, plaintiffs have pointed to no evidence of intentional discrimination or bad faith other than conclusory allegations that machine repair was a "non-favored trade." [Doc. 191, at 3]. As with the 2002 demarcations, plaintiffs have not presented "substantial evidence of . . . intentional, severe" discrimination "unrelated to legitimate union objectives." *Amalgamated Ass'n of Street Elec. Ry. & Motor Coach Employees*, *supra*, 403 U.S. at 301. Nor have they alleged facts supporting a claim of bad faith on the part of the union. Plaintiffs have not alleged facts supporting an inference that Edwards, nor Daimler Chrysler representatives with whom he worked, were in some way biased toward machine repairmen.

25

Edwards attempted to include skilled trade stewards – including machine repair stewards Davis and McIntyre – in the process leading to the 2005 lines of demarcation. Davis did not attend the first meeting, and McIntyre attended only part of one meeting.

Plaintiffs point out that McIntyre sought to become involved in the lines of demarcation process, but was told by Edwards that the project was not at his level yet. The fact that McIntyre sought unsuccessfully to become involved in the process at one point, when at another point he had refused to participate, is not enough to create a genuine issue of material fact about whether the demarcation process or decisions were arbitrary. After his failed attempts to involve the skilled trade stewards, Edwards also spoke with six to twelve machine repair employees on the floor about their work.

Second, plaintiffs admit that there is no contractual provision guaranteeing them the work they claim the committee wrongfully took from them. There is, accordingly, no objectively "correct" set of demarcations.

As defendants point out, plaintiffs offer no single, much less workable alternative to the 2005 demarcations which Edwards established.

Plaintiff William Pearsall testified that he believes the disputes can be settled by a meeting and issues are settled by grievances. Plaintiff Dennis Stephenson drafted different lines of demarcation but admits that even if Daimler Chrysler agreed to his version, other trades would dispute them.

Thus, while plaintiffs may have presented evidence about whether, in the abstract, the lines of demarcation best apportion work among different skilled trades, they have not demonstrated that the union's actions were arbitrary.

26

Plaintiffs have not alleged facts demonstrating that Edwards' actions in establishing the 2005 demarcations fall unlawfully outside the "wide range of reasonableness." *Marquez*, *supra*, 525 U.S. at 45. The process leading to the demarcations and the individual decisions may not have been the best, but they were not arbitrary. Edwards attempted to involve skilled trade stewards, and after that attempt failed, spoke with persons actually performing various jobs in the plant.

Summary judgment is therefore granted to defendants on this claim.

### C. UAW International

Defendants also assert that plaintiffs have not shown that the International breached its duty of fair representation. I agree.

The only involvement of the International to which plaintiffs point is the visits by Brown to the Toledo plant.

During his visits to the Toledo Jeep plant Brown only looked at things union representatives told him were in dispute. He testified that during his 2003 visit, he had not had time to look at everything, but was willing to come back if Local 12 asked.

Plaintiffs make no allegation that Brown was not knowledgeable about what trade performed what work, or that he was biased against machine repairmen. Finally, recommendations on lines of demarcation made by the International were only advisory, not binding on the local union or Daimler Chrysler.

While plaintiffs may not like the structure of Brown's visits or their outcome, they present no evidence that the International had a contractual or constitutional duty to conduct the visit in any other way. Plaintiff thus cannot demonstrate that the International acted in bad

27

faith or in a discriminatory or arbitrary manner. Summary judgment is therefore granted to defendants on the duty of fair representation claim against the International.

### D. Cross-Training

Defendants also move for summary judgment on plaintiffs' claim of discriminatory cross-training. Plaintiffs contend that Daimler Chrysler established a program of cross-training skilled employees to perform jobs they had not customarily performed and that the union helped ensure that machine repairmen were not cross trained as frequently as millwrights and electricians, "thereby resulting in plaintiffs receiving considerably fewer hours and employment opportunities." [Doc. 68, at 13].

Defendants argue that even if some electricians and millwrights attended training outside of their trade and machine repairmen did not, this does not prove discrimination. Defendants additionally argue that "[p]laintiffs simply cannot show that the failure to receive training adversely impacted their jobs." [Doc. 180-1, at 38].[9]

Plaintiffs respond with plaintiff Dave Grabowski's affidavit detailing his analysis of training records from the Company from January 1, 1996, through May 14, 2003. [Doc. 135]. Based on the records, Grabowski concluded that while other trades frequently attend machine repair classes, electrician and millwright specific classes are only attended by members of that trade.

Second, plaintiffs assert that work has been "systematically shifted from machine repairmen to millwrights and electricians" and "[i]t is obvious that persons trained to do one

---

[9] Plaintiffs assert that this statement is conclusory and therefore insufficient to meet the requirements of Fed R. Civ. P. 56. I disagree. This statement sufficiently informs plaintiffs of the basis of defendants' summary judgment motion.

28

kind of work cannot be assigned to do other kinds of work without being trained to do that work." [Doc. 184, at 40].

Plaintiffs, however, point to nothing in the record demonstrating that any machine repairman lost work because electricians or millwrights took machine repair classes. Plaintiffs have therefore not shown that, even if the union acted arbitrarily as to cross-training, injury resulted. Plaintiffs have presented no evidence that an electrician or millwright who took a machine repair class would be, per company or union policy or practice, assigned work demarcated as machine repair work. *See Wood*, *supra*, 807 F.2d at 502. Summary judgment is therefore granted to defendants on this claim.

### E. Apprenticeships

Defendants also assert that they are entitled to summary judgment on plaintiffs' apprenticeship claim because: 1) plaintiffs are not claiming a breach of the collective bargaining agreement (which describes apprenticeship standards); 2) the duty of fair representation does not require any particular apprenticeship standards; and 3) the apprentices received their journeyman's cards at the end of the apprenticeship program.

Plaintiffs' complaint alleges defendants "deliberately weakened machine repairmen apprenticeship standards by eliminating machine shop time." [Doc. 68, at 14]. Plaintiffs allege, in essence, that national standards require machine repair apprentices to receive a certain amount of machine shop training and that training is not provided to machine repair apprentice members of the Local 12.

Plaintiffs submit affidavits by David Dillon, Frank Vitale and Rex Maze, who allege they were given only a fraction of the machining training required by national standards.

29

These affidavits also point out that letters they received from the National Training Center stated they received more machining training than they actually had. Defendants point to Bob Bochi's testimony that machine repairmen at the Toledo North Jeep plant do not perform machining work.

Again, the union can only violate its duty of fair representation if it acts in a way that is "arbitrary, discriminatory, or in bad faith." *Vaca*, *supra*, 386 U.S. at 190. Plaintiffs do not dispute that machine repairmen at the Toledo North Jeep plant do not perform machining work. I find that plaintiffs therefore have not shown an issue of material fact as to whether it is outside the "wide range of reasonableness" for the union to participate in an apprenticeship program that did not give plaintiffs training in work they would not be asked to do. *Marquez*, *supra*, 525 U.S. at 45.

Additionally, plaintiffs have not alleged any facts showing that, as a result of the inadequate training, they lost, or did not get work in the Toledo Jeep plant.[10] While plaintiffs seemingly allege facts supporting a claim that they did not get training promised under the collective bargaining agreement, they have not shown that, "but for the union's conduct," *Wood*, *supra*, 807 F.2d at 502, they would have gotten more work.

### F. Job Bank

Finally, defendants assert they are entitled to summary judgment on plaintiffs' duty of fair representation claim regarding the job bank because: 1) the Company and union must agree to who is placed in the job bank; and 2) the union determined who to suggest for the job bank on a case-by- case basis depending on what work needed to be done.

---

[10] Plaintiffs have similarly not alleged any connection between any inadequate training and the "considerable emotional distress and pain and suffering" they allege in their complaint. [Doc. 68, at 14].

Plaintiffs contend that the union routinely placed millwrights and electricians with less than three years seniority into the job bank, but never placed machine repairmen with less than three years seniority.[11]

Plaintiffs show that between 2001 and 2003, more than fifty millwrights with less than three years seniority were paid out of the job bank, while no machine repairmen with less than three years seniority were. Defendants do not dispute this fact, but argue, based on Nick Vuich's supplemental affidavit, that the union's decision was based on legitimate criteria and thus not arbitrary.

Vuich's affidavit states that, during his time as Chairman of Local 12, the union received calls from charities and churches needing help with construction projects. He described the process for determining when people are paid out of the job bank:

> If management and myself agreed the Plant would send people with those skills out into the community to work for those charities. If there were no available people in the job bank we would pay persons with those skills out of the job bank to go out into the community and do that work. This meant that there were occasions during those years that persons possessing the requisite skills, which were millwrights and electricians who did that kind of work in the Plant, were paid out of the job bank even thought they had less than three years seniority.

[Doc. 183-43].

_____

[11] Plaintiffs' opposition also states: "[W]hile machine repairmen who were finally able to be placed in the job bank were told that persons in the job bank could not work overtime, a large number of such workers collected more than 40 hours pay per week." [Doc. 184, at 42]. Plaintiffs cite the affidavit of William Pearsall [Doc. 132] to support this statement. Pearsall's affidavit, does not, however state that persons in the job bank were told they could not work overtime. Plaintiffs have therefore failed to show a genuine issue of material fact as to whether the union violated its duty of fair representation with regard to overtime in the job bank.

31

Finally, Vuich states that "to [his] knowledge" machine repairmen "with less than three years of seniority were not sent out only because their machine repair skills were not needed to do the construction work." *Id.*

Plaintiffs' response argues that Vuich, in contrast to the statements in his affidavit, testified that people paid out of the job bank do "community-type work," "refurbishing churches," and "some painting, electrical work, that type of work." [Doc. 184, at 42 (quoting Doc. 162, at 23)].[12] Plaintiffs argue that "[w]hile there may be certain work particular to the skills and experience of a particular skilled trade, much of the work described does not appear to require skilled labor." *Id.*

Plaintiffs response does not create an issue of material fact because it offers no facts to dispute Vuich's assertion about the manner in which the union determines when someone with less than three years seniority can be paid out of the job bank.

Plaintiffs' response, rather, only challenges whether work was available that a machine repairman could do. This does not undermine Vuich's assertion that workers with less than three years seniority were only paid out of the job bank if there was no one in the job bank able to perform the job *and* the work required a particular skill.

Plaintiffs have not presented any evidence to demonstrate that the union's procedure for paying employees with less than three years seniority out of job bank funds is discriminatory, or arbitrary.

Because plaintiffs have alleged no facts tending to show that the union's actions in determining who would be paid out of job bank funds were discriminatory, or outside the

---

[12] I note that the testimony plaintiffs cite is in the context of what type of work Vuich had people do out of the job bank during his tenure as the job bank coordinator from 1990-92, not during the time period in question in this case.

32

"wide range of reasonableness," *Marquez*, *supra*, 525 U.S. at 45, so as to be "wholly irrational." *Garrison*, *supra*, 334 F.3d at 538.

I conclude defendants are entitled to summary judgment on plaintiffs' duty of fair representation claim regarding the job bank**.**

**Conclusion**

For the foregoing reasons, it is hereby:

ORDERED THAT:

1. Defendants' motion for summary judgment [Doc. 180] be, and the same hereby is granted.

2. Plaintiffs' motion for partial summary judgment [Doc. 189] be, and the same hereby is denied.

s/James G. Carr
James G. Carr
Chief Judge